J.H.,                                    )
                                         )
            Plaintiff,                    )
                                         )
            vs.                           )            Cause Number: 2:12-cv-69 PS
                                         )
SCHOOL TOWN OF MUNSTER, et al.,          )
                                         )
            Defendants,                   )

## OPINION AND ORDER

It's often been said that high school is the best four years of your life.  But for one young man, Plaintiff J.H., high school was anything but.  J.H. was a student at Munster High School and a member of the high school swim team during his Freshmen and Sophomore years.  J.H. soon discovered, however, that hazing was rampant on the team and much of it was directed at him.  After enduring this physical and emotional mistreatment for two years, J.H. ultimately quit the team and left Munster High School early.  He brings this § 1983 action against both the school and various school officials in their individual and official capacities, for the following claims: discrimination based on gender under the Equal Protection Clause and Title IX; retaliation under the First Amendment; and a negligence claim under Indiana state law.  Defendants now seek summary judgment on all claims.  (DE 73.)  For the  reasons discussed in this Order, that motion will be **GRANTED-IN-PART** and **DENIED-IN-PART**.

### Factual Background

J.H.'s troubles on the Munster swim team started at least as early as February

2010.  J.H. attended a pre-sectionals party as a Freshman where the team's members dyed and cut their hair and then wore it that way before they shaved their heads prior to the sectional meet.  (The head shaving was designed to improve their swimming times because hair provides drag.)  The trouble was that J.H. didn't want his hair dyed and cut.  Despite his protests, J.H. states that he was physically dragged into the bathroom and forced to have his hair cut and dyed.

According to J.H., things didn't get much better after that.  His teammates engaged in various hazing activities against both J.H. and his teammates, most of which he experienced first-hand on multiple occasions such as: applying Icy Hot to boys without their consent to create an uncomfortable burning sensation; "five starring" teammates whereby one boy hits another with an open palm, creating a red "star" on their bare back; beating teammates with a plastic wiffle ball bat known as the "peace maker;" forcing younger teammates to carry the lunch trays of older team members; forcing younger team members to clean the locker room and bus; and forcibly moving younger team members out of shower stalls when older members wanted to use them; stealing each other's swim equipment; and hitting each other with swim fins.

Eventually, all of this got to be too much and J.H. began telling his mother about the incidents around January 2011.  Specifically, he told her about the February 2010 hair-dyeing party.  Understandably concerned, Ms. Hunt met with J.H.'s coach, Coach Pavlovich, on January 21, 2011 to alert the coach to what was happening at those yearly parties.  According to Ms. Hunt, Coach Pavlovich brushed off the incident by saying "[i]t's probably best if we don't do anything about it at this point.  It happened a year

ago. A lot of those kids are gone." (DE 83-1 at 29.) He also told Ms. Hunt that "there were a lot of traditions already in place when [I] took over this team." (*Id*. at 58.)

Not satisfied with this response, Ms. Hunt then met with Athletic Director Smith on February 3, 2011. They discussed the hair-dyeing parties and Smith asked if J.H. was planning on attending the next hair-dyeing party. Ms. Hunt responded that he was not. According to Ms. Hunt, when she referred to what happened at the February 2010 party as hazing, Smith said, the "boys don't look at it as hazing. They look [at it] as initiation." (DE 83-1 at 45.) Ms. Hunt also asked Smith to get the word out to other parents and swimmers about what happens at the pre-sectional parties. (*Id*. at 52.) When J.H. failed to attend the 2011 hair-dyeing party, his teammates were not happy and he was verbally threatened for not attending.

Still not feeling like she was getting any traction with school officials, Ms. Hunt then emailed Coach Pavlovich and Athletic Director Smith with an article about the dangers of hazing on February 9, 2011. (DE 79-11 at 3.) But just five days later, J.H. was violently attacked in the boys locker room after practice. According to J.H., some boys grabbed him, lifted him up, and carried him over to another boy who was holding electric hair clippers. J.H. resisted and eventually the boys dropped him to the cement floor, on his back. J.H. was able to run away from the boys before they attacked him any further. There were no coaches in the locker room at the time of the incident, as was typical at that time because coaches were rarely in the locker room after practice.

At first, J.H. didn't tell his mother about the attack. In fact, he didn't tell her about it until late in May of 2011. So without knowing about this most recent incident,

Ms. Hunt called Principal Tripenfeldas to report what happened at the pre-sectional hair-dyeing parties and to request that he made sure that Athletic Director Smith investigated the February 2010 incident she reported. A couple of days later, Ms. Hunt met with Superintendent Pfister about hazing in the boys swimming program. When Ms. Hunt told Mr. Pfister about what happened to J.H. at the February 2010 hair-dyeing party, his initial response was "[h]ey lady, your kid's hair got cut" and that the school would not be getting involved because the incident occurred off campus. (DE 83-1 at 90-91.) Pfister did concede to Ms. Hunt that J.H. may have a valid complaint against the parents who hosted the party, but concluded that it wasn't the school's problem. (*Id*. at 91.) Pfister did, however, order an investigation, but considered the matter closed once he learned it occurred off-campus. (DE 83-9 at 46-47.) Both he and Tripenfeldas later admitted that some measure of discipline could have been taken. (DE 83-9 at 44; DE 83-8 at 26.)

Aside from the hair-dyeing incident, Tripenfeldas' investigation didn't reveal anything that he considered to be hazing. What Tripenfeldas believes is hazing, and what J.H. thinks it is, may not be one and the same. Tripenfeldas characterized what he discovered in the investigation as incidents of "pranks and horse play."(DE 83-20 at 10.) And since the hair-dyeing parties occurred off-campus, he and Pfister both considered the matter closed.

Ms. Hunt next contacted the school on April 18, 2011 to schedule another meeting with Superintendent Pfister. She did not, however, hear back from the superintendent until one month later, on May 18, 2011. On May 23, 2011, Ms. Hunt

submitted a formal written complaint regarding hazing in the boys swim team and met

with Superintendent Pfister. That same day, J.H. told his mom that he was being

verbally harassed and pushed around by some swim teammates. J.H.'s mom met with

the dean of students about the issue, and he then interviewed J.H. alone. Although the

dean at first seemed to think there wasn't an issue to pursue, he later told Ms. Hunt that

the issue had been addressed. (DE 83-1 at 115-116.) That same day, J.H. concluded that

he could no longer attend Munster High School.

Communications between the school officials and Ms. Hunt really broke down

after that point. Once Ms. Hunt learned what had happened to her son in the locker

room in February 2011, she reported the incident to both the police and Principal

Tripenfeldas. She informed Tripenfeldas that she wanted to be present when he

interviewed J.H. Tripenfeldas told her "we don't have to do that."(DE 83-1 at 129.)

After she said she thought she had a right to be there and that she had been consulting

an attorney, Tripenfeldas gave her the school attorney's contact information and ended

the discussion. (*Id*. at 130.) It doesn't appear there was much communication between

Ms. Hunt and the school after that. In fact, when J.H. elected not to swim over the

summer, his email address was removed from the team mailing list. J.H. decided not to

return to swimming the following semester.

Athletic Director Smith investigated the February 2011 locker room attack, but

ultimately didn't find any additional hazing in his interviews with the swimmers. (DE

83-7 at 43.) All he learned was that the pre-sectional parties had been happening for

years at a parent's home, that swimmers were not required to attend, and that some

boys may have had their hair cut or dyed involuntarily.  (*Id*. at 10-11.)  In fact, one student had later had his eyebrow shaved off involuntarily as retribution for not attending one of the parties. (*Id*. at 12.)  Ultimately, Smith, Tripenfeldas and Pavlovich did want to ban the hair-dyeing parties, but decided not to do so after meeting with the mother of a swimmer who indicated that she and the other swim team parents wanted the parties to continue.  (*Id*. at 17-18.)  Smith did inform that parent that the school did not approve of the parties and that they preferred the parties not occur.  *(Id*.)  The parties, however, continued.  (DE 83-8 at 17.)

All of this had a profound impact on J.H.  According to J.H., the hazing he endured forced him to quit the swim team and graduate early. (DE 83 at 137-38, 169.)  His grades also declined and he suffered psychological effects such as anxiety, depression, and thoughts of suicide, all requiring treatment.  (DE 83 at 139-40, 148, 169.)

## Discussion

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In making this determination, I must construe all facts and draw all reasonable inferences from the record in the light most favorable to the nonmoving party.  *Id*. at 255.  Failure to prove an essential element of a plaintiff's case necessitates summary judgment in favor of the defendant because "[i]n such a situation, there can be 'no genuine issue as to any

material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### *"Official Capacity" Claims*

As noted above, J.H. has sued the school and the school officials in their official capacities (in addition to their individual capacities). But a claim against a school official in his official capacity "is not a suit against the official but rather is a suit against the official's office .... As such, it is no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) (citation omitted). Therefore the claims against Pfister, Tripenfeldas, Smith, and Pavlovich in their official capacities are redundant of the claims against Munster. I will therefore **DISMISS** all claims against Pfister, Tripenfeldas, Smith, and Pavlovich in their official capacities.

### *Section 1983 Equal Protection Claim*

J.H.'s argument on his Equal Protection claim boils down to essentially this: boys who participate in swimming at Munster High School can expect an entirely different experience than girls can. The boys program is one where hazing runs rampant; not so in the girls swim program. To prove his equal protection claim, J.H. must offer evidence that demonstrates that (1) Munster acted with a discriminatory intent or deliberate indifference and (2) J.H. is a member of a protected class. *Hayden v. Greensburg Community School Corp.*, 743 F.3d 569, 577 (7th Cir. 2014); *Doe v. Galster*, 768 F.3d 611, 622 (2014). The second part is easy – J.H. claims that he was discriminated against based on the fact that he is a male, and gender is a protected class under the Equal Protection Clause. *Hayden*, 743 F.3d at 577.

But the first requirement – that Munster acted with a discriminatory intent or deliberate indifference – requires more discussion.

Whether a defendant has acted with discriminatory purpose is generally a question best left for a jury. *Locke v. Haessig*, 788 F.3d 662, 670-73 (7th Cir. 2015). At the outset, it should be noted that a school corporation is not generally responsible under Section 1983 for constitutional deprivations inflicted by its employees or agents, as there is no *respondeat superior* liability under Section 1983. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978). In other words, Munster generally speaking cannot be found liable for the acts committed by its coaches, teachers, administrators, etc. But there are three well known exceptions to this rule: Munster *can* be found liable under Section 1983 if J.H. can show: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Teesdale v. City of Chicago*, 690 F.3d 829, 834 (7th Cir. 2012); *see also Antle v. Portage Township Schools*, No. 2:11-cv-60-PRC, 2013 WL 4048543, at *17 (Aug. 9, 2013) (finding school corporation can be held liable under Section 1983 under this paradigm). Here, only the latter two options – a widespread practice or constitutional injury caused by a final policymaker – are at issue as there is no allegation that Munster had an express (*e.g.* written) policy of ignoring hazing.

J.H.'s argument is essentially that the Defendants were willfully turning a blind eye to all of the awful things going on in the male swimming program because "boys will be boys." Such a policy of non-response – that is, "a deliberate refusal to respond to

8

complaints of harassment" – is actionable under the Equal Protection Clause. *Bohen v. City of East Chicago, IN,* 799 F.2d 1180, 1190 (7th Cir. 1986) (Posner, J. concurring, *citing Hunter v. Allis-Chambers Corp.,* 797 F.2d 1417, 1421-1422 (7th Cir. 1986)). In essence, it's not necessary to show that Munster had a policy of forcing the boys to do or not do something that didn't apply to the girls. Instead, indifference to the boys' welfare is enough. *Id.* at 1191.

In pursuing this theory, J.H. must show a connection between Munster's alleged custom or practice and his injury. *Rice ex rel. Rice v. Corr. Med. Servs.,* 675 F.3d 650, 670 (2012). So what all this boils down to is that J.H. must show that Munster engaged in a widespread practice of ignoring complaints of hazing from the boys' swimming program, either intentionally or with deliberate indifference to the boys' rights, simply because the complaints were coming from boys and not girls. *See e.g. Hayden,* 743 F.3d at 583 (intentional discrimination can be shown by either deliberate indifference or a discriminatory school policy). J.H. can show this based on evidence of his own treatment, in addition to the treatment of others on his team. *Bohen,* 799 F.2d at 1187 (Maj. opinion).

This case bears a striking resemblance *Hayden* where a public high school had various policies governing the appearance of its student athletes. 743 F.3d at 572. Although a written policy proscribed various restrictions on both males and females regarding how they could wear their hair, an unwritten (but enforced) policy set forth by the boys' basketball coach placed additional restrictions on his team members. *Id.* Namely, his players could not wear long hair and the plaintiff, who wore his hair long, was not allowed to play on the team until he cut his hair. *Id.* The court found that the policy led

to the disparate treatment of males versus females insofar as the males were "subject to a burden that a girl in the same position is not" and that was enough to make out a prima facie case of discrimination under the Equal Protection Clause. *Id*. at 580. As the court reasoned:

> The hair-length policy applies only to male athletes, and there is no facially apparent reason why that should be so. Girls playing interscholastic basketball have the same needs as boys do to keep their hair out of their eyes, to subordinate individuality to team unity, and to project a positive image. Why, then, must only members of the boys team wear their hair short? Given the obvious disparity, the policy itself gives rise to an inference of discrimination.

*Id*.

Which brings us back to J.H.'s situation. Here, I must determine whether J.H. has presented sufficient evidence for the jury to infer that Munster had a policy of ignoring hazing on the boy's team such that it ended up with a boys team that was infested with hazing and a girls team that apparently had none. Admittedly, the situation in J.H.'s case is a little more nuanced than that of *Hayden*. Here, there is no *express* policy of allowing hazing to occur in one program and not the other. But J.H. has presented evidence that would allow a jury to infer such an unspoken policy exists. In support of his theory, J.H. has presented a laundry list of ways that the officials at the school ignored hazing in the boys program:

- Coaches saw and either ignored or minimized incidents of hazing on the pool deck (*See e.g.* DE 83 at 36, 86, 187.)

- Coaches were not present in the locker rooms either before or after practices, even after J.H.'s mother notified school officials about her concerns regarding hazing in

the boys program, including notifying: (1) Coach Pavlovich on January 31, 2011 and February 9, 2011; (2) Athletic Director Michael Smith on February 3 and 9, 2011 (in fact, the attempt to shave J.H.'s head in the locker room occurred just a short time after on February 16, 2011); (3) Principal Tripenfeldas on March 7 or 8, 2011; and (4) Superintendent Pfister on March 9, 2011 and May 23, 2011 (her formal complaint). In fact, coaches were not regularly in the locker room until the following school year. (*See e.g.* DE 83-2 at 21-22.)

- Coaches did not even mention any concerns regarding hazing to the swim team members until June of 2011, nearly six months after J.H.'s mother first raised her concerns and four-plus months after J.H. was attacked in the locker room. (*See e.g.* DE 83-11 at 27; DE 83 at 183-84; DE 83-2 at 40-42.)

- When school officials were informed about concerns of hazing, they minimized the acts as "pranks and horse play" (DE 83-20 at 10), or even worse, "initiation" (DE 83-1 at 45) and "tradition" (*Id.* at 58).

When viewed in the light most favorable to J.H., the non-moving party, a reasonable jury could conclude that Munster didn't really care whether their male swimmers were being harassed.

Munster argues that there isn't enough evidence to even infer such a policy exists because there simply isn't enough information about what's going on in the girls team to conclude there is any disparate treatment at play. But it is difficult to prove a negative. J.H. relies on basically one theory to support his claim that there is no hazing in the girls program: that because school officials were (and still are) unaware of any complaints of

hazing in the girl's program, it must not be happening. In support, J.H. points to the depositions of Superintendent Pfister, Principal Trippenfeldas, and Athletic Director Smith all stating that they have received no complaints of hazing in the girls program. (DE 83-9 at 52; DE 83-8 at 23; DE 83-7 at 31.) Munster also represented in its response to J.H.'s admission requests that "[i]nquiries were made which included whether there were any complaints made by a student, parent or third party as to any 'hazing' with respect to a member of the girls swim team" and that "the Defendants are unaware of whether any members of the girls swim team were subjected to 'hazing' due to the lack of any complaint from a student, parents or any other third party." (DE 83-19 at 4.)

I think this is enough for the jury to at least infer that there was no hazing in the girl's program. At a minimum, this creates a material fact question that precludes my granting summary judgment for the defendants. Although the evidence is admittedly far from overwhelming, the evidence was similarly thin in *Hayden* regarding whether the girl's basketball team had a similar hair-length policy to the boys' policy. There, the only evidence regarding the girl's team was that the parties had stipulated to the fact that both teams were subject to grooming policies, but there were no details provided as to what those policies were and whether they were comparable. *Hayden*, 743 F.3d at 580. All that was known was that the girls team did not have a hair-length policy. Even so, the court found that "absent any evidence as to the content of the grooming standards that are applicable to female athletes, we are not prepared to simply assume that an otherwise facially-discriminatory rule is justified." *Id*. And I should note that because that dispute was submitted to the court on stipulated facts for final judgment, the court actually found

that evidence was sufficient to render *judgment* in the plaintiff's favor. *Id.* Certainly similar evidence is sufficient to simply allow the question to get to the jury.

Further, requiring more definitive proof, as Defendants would have me do, would misapprehend the level of proof required at this stage. At this point, J.H. doesn't have to prove definitively that there was no hazing in the girl's program, just as the plaintiff in *Hayden* didn't have to show exactly which grooming policies applied to the girls program. It was enough that it appeared that the hair-length policy didn't apply to the girls and that there was no evidence to the contrary. *Hayden*, 743 F.3d at 582. Here too, there is enough evidence for a reasonable jury to infer that Munster maintained a hazing-infested swim team for boys and not for girls because there was a widespread practice at Munster of ignoring hazing on the boys team. Munster can, and I'm sure will, present evidence aimed at rebutting that presumption at trial. And at that point, it'll be up to the jury to decide what to do with it.

Aside from the *Monell* claim against Munster, J.H. has also provided enough evidence to allow a reasonable jury to conclude that the individual defendants named were deliberately indifferent to the hazing on the boys team. Showing a conscious failure of the defendants to protect J.H. from the abuse he endured is enough to establish deliberate indifference for an equal protection claim. *Bohen*, 799 F.2d at 1187; *see also id.* at 1190 (J. Posner concurring ("a deliberate refusal to respond to complaints of harassment" is actionable under the Equal Protection Clause.). J.H. has set forth sufficient evidence to support his claim. There's no need to go through every bit of evidence at this point, and much of this evidence is the same as that already discussed directly above, but it's worth

laying out some of the more salient points as they specifically relate to each defendant school official:

• **Coach Pavlovich**:  Lack of supervision on both the pool deck and in the locker rooms despite his knowledge that he was expected to supervise those areas (*see e.g.* DE 83-2 at 21-22; DE 83-10 at 23-24); failure to even raise the issue of hazing at all with his swimmers until nearly six months after he was notified of the issue (*see e.g.* DE 83-11 at 13; DE 83 at 183-84; DE 83-2 at 40-42.); knowledge of the head-shaving parties prior to January 2011 and reference to them as "tradition" (DE-83-1 at 58); knowledge that J.H.'s hair was dyed and shaved involuntarily (DE 83-10 at 15, 35); brushing off the February 2010 head-shaving incident once he learned of it in January 2011 by saying "[i]t's probably best if we don't do anything about it at this point.  It happened a year ago.  A lot of those kids are gone." (DE 83-1 at 29); failure to discipline misuse of Icy Hot (DE 83 at 37); failure to investigate the February 2010 head-shaving incident and lack of knowledge as to whether Munster did so (DE 83-10 at 18); accusing J.H. of being "irresponsible" when J.H. reported having his equipment stolen, even though his equipment being stolen was a part of the hazing he was enduring (DE 83 at 23-24); knowledge that he could discipline swimmers for off-campus behavior (DE 83-10 at 43-44).

• **Athletic Director Smith**: Referring to the hazing incidents reported to him as "initiation" (DE 83-1 at 45); knowledge of the hair-dyeing parties by at least late January or early February 2011 (DE 83-1 at 52) and of the fact that J.H.'s hair had been dyed and cut against his will (DE 83-1 at 49); knowledge that someone had

their eyebrow shaved against his will by at least June 2011 (DE 83-7 at 12); failure to prohibit hair-dyeing parties despite initial discussion about banning them after learning that some kids have their hair dyed and cut against their will (DE 83-7 at 24-25); failure to uncover any additional hazing in his own investigation of the boys swimmers after the report of the February 2011 locker room assault on J.H. (DE 83-7 at 43); belief that the February 2011 assault on J.H. was hazing (*Id*.); knowledge that the school could discipline swimmers for certain off-campus behavior (DE 83-7 at 21); failure to discipline coaches for not supervising the locker room, despite that Smith had the authority to do so (DE 83-10 at 23-24; DE 83-7 at 6-7).

- **Principal Tripenfeldas**: Minimization of hazing activity as "pranks and horse play" in the official report of his investigation into the allegations contained in J.H.'s formal report (DE 83-20 at 10); failure to prohibit hair-dyeing parties despite his desire to do so after learning what happened to J.H. at the February 2010 party (DE 83-8 at 17-19); knowledge that the school could discipline some off-campus activity if it impacted the educational environment of the entire school (*Id*. at 26); belief that the February 2011 locker room assault and the practice of swimmers carrying other swimmer's trays was hazing (*Id*. at 29); failure to discipline the swim coaches for not appropriately supervising the locker room or pool deck (DE 83-10 at 53-54; DE 83-8 at 12, 27-28).

- **Superintendent Pfister**: After learning what happened to J.H. at the February 2010 hair-dyeing party, he ordered an investigation, but considered the matter closed once he learned it occurred off-campus, despite that some measure of discipline

15

could have been taken (DE 83-9 at 44, 46-47, DE 83-8 at 26); when Ms. Hunt told Pfister about what happened to J.H. at the February 2010 hair-dyeing party, his initial response wasn't exactly sympathetic: "[h]ey lady, your kids's hair got cut" and that the school would not be getting involved because the incident occurred off campus (DE 83-1 at 90-91); when Ms. Hunt contacted Pfister's office about a month later to discuss a "very serious matter" relating to J.H., Pfister delayed meeting with her for a month (DE 83-1 at 98-99).

Of course most of what is above is disputed by Defendants. But that's the point – I can't grant summary judgment to Defendants where there are questions as to material facts like the ones above, because if these facts are as J.H. presents them, this is enough to support his claims. What does not appear to be disputed, however, is that each of these individuals had final policymaking authority. (*See* DE 77, 86.) Indeed, as outlined above and in J.H.'s briefing, each of the defendants had the power to discipline the swimmers for their behavior, to discipline those employees they supervised, and to set the rules for the swim team. But even if defendants do dispute this point (although it's not argued in the briefing), that just creates another fact question and another reason to deny their summary judgment motion. Whether their individual actions will be enough to past muster under a theory of constitutional deprivation at the hands of a final policymaker will be something for the jury to decide.

The individual school official defendants, however, argue that regardless of whether the facts above are true, they should be shielded by qualified immunity which protects government officials from liability for performing discretionary functions so long as "their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Nabozny v. Podlesny*, 92 F.3d 446, 455 (7th Cir. 1996). But the Seventh Circuit rejected the same argument under very similar circumstances in *Nabozny*. There, a high school student brought a claim against school officials in their individual capacities for a failure to protect him from harassment he endured based on his sex. *Id.* In evaluating whether the officials could be protected by qualified immunity, the court focused on two primary questions: (1) whether the law clearly established that the Equal Protection Clause required school officials to give equal protection to males and females; and (2) whether that law was clearly established in 1988 (when the plaintiff's issues first started). *Id.* at 455-56. The court found the answer to both questions was clearly yes, and therefore the officials' claims of immunity failed. *Id.* at 456. Here, too, the law was clearly established by 2009 or 2010, when J.H.'s issues started, that school officials were required to provide equal protection to males and females. A failure to comply with that law negates qualified immunity.

### Gender Discrimination Under Title IX

The same material fact questions above also prevent me from granting summary judgment to Defendants on J.H.'s Title IX claims. Section 901(a) of Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). No one disputes that Munster is subject to Title IX's prohibition on sex discrimination. It is also undisputed that individuals may bring private suits for equitable relief and damages when a school

violates Title IX.  *Hayden*, 743 F.3d at 583.

While the standards for proving discrimination under Title IX and the Equal Protection clause "may not be wholly congruent," here the proof required overlaps significantly.  *Levin v. Madigan*, 692 F.3d 607, 614 (7th Cir. 2012) (finding that to prove discrimination under Title IX, a plaintiff must show that a school administrator acted with deliberate indifference, whereas an equal protection claim requires proving a custom or practice was at play).  In the typical Title IX discrimination case where students are harassing each other or where a teacher harasses a student, a plaintiff must show (1) discriminatory harassment of which the school has (2) actual knowledge and yet (3) treats with deliberate indifference, and (4) the harassment must be severe and objectively offensive enough that it deprives the plaintiff of access to educational opportunities.  *Doe v. Galster*, 768 F.3d 611, 614 (7th Cir. 2014).  But in *Hayden*, the Seventh Circuit found that paradigm doesn't necessarily apply when the discrimination is, as here, a school policy.  *Hayden*, 743 F.3d at 583 (attributing an intent to discriminate under Title IX to the school district where "[t]he discrimination at issue here takes the form of a school policy.").  Instead, the policy alone suffices to establish an intent to discriminate.  *Id.*  The court did not, however, address whether a plaintiff still needs to demonstrate that the harassment is severe and pervasive enough to deprive the plaintiff of educational opportunities, or whether the "intent" is enough to show actual knowledge and/or deliberate indifference.  Here, I think J.H. has also shown those elements, so his claim can proceed under either paradigm.

Again, J.H.'s argument is that Munster engaged in a practice or custom of deliberate

indifference such that the school purposefully ignored complaints of hazing in the boys program based on gender. Thus, the same evidence supporting that the custom or practice exists, identified at length above, also supports deliberate indifference since the custom or practice *was* deliberate indifference. And since the basis of the claim is the school's own policy, they obviously had actual knowledge of it (and in any event, as the evidence above shows, they had actual knowledge of the specific acts of hazing by at least the winter and spring of 2011).

So the only thing left not previously addressed is whether the actions were severe and pervasive enough to deprive J.H. of educational opportunities. To prove this element, J.H. must present evidence showing discrimination "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651. Here, too, I find J.H. has presented enough evidence. J.H. has presented evidence that because of Defendant's inaction regarding hazing on the boy's swim team, he was forced to quit the swim team and graduate early, and that his grades declined. (DE 83 at 137-38, 148, 169). He also suffered psychological effects such as anxiety, depression, and suicidal thoughts, all requiring treatment. (DE 83 at 139-140.) Evidence of this nature is generally found to be enough for showing sufficiently pervasive and severe discrimination. *See Gabrielle v. Park Forest-Chicago Heights Ill. School Dist.*, 315 F.3d 817, 823 (7th Cir. 2003) (examples of negative impact on education includes dropping grades and absenteeism; J. Rovner in dissent finding psychological impact alone can be enough); *Zeno v. Pine Plains Central School*, 702 F.3d 655, 667 (5th Cir.

2012) (finding leaving a school program early is sufficient evidence of negative impact).

One key difference between an equal protection and Title IX claim is that unlike an equal protection claim brought under Section 1983, Title IX authorizes suits against institutions and programs *only* and does not authorize suits against school officials, teachers, or other individuals. *Levin*, 692 F.3d at 614. A plaintiff can, however, use evidence that "a single school administrator with authority to take corrective action responded to harassment with deliberate indifference" to establish liability under Title IX, whereas such a showing would be insufficient under the Equal Protection Clause without the additional showing of a widespread custom or practice. *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246, 257 (2009). So basically, J.H. can't bring a Title IX claim against the school administrators, but can use evidence of what those administrators did (or, in this case, didn't do) to support his claim against the school itself. Thus, I will **DISMISS** J.H.'s Title IX claim against the individual school officials (Pfister, Tripenfeldas, Smith, and Pavlovich). But his Title IX claim based on the inequality between the girl's and boy's swimming programs will proceed against Defendant Munster.

### Gender Stereotyping, "Sex-Plus," and Class Year Claims

J.H. also argues that Defendants have discriminated against him based on gender stereotypes and his class year under both the Equal Protection Clause and Title IX. The same standards discussed at length above also apply here: for his Equal Protection Claim against Munster, he must show a custom or practice of discrimination based on gender stereotypes and/or class year; for the same claim against the school officials, he must show that they discriminated against him based on those same classifications; and under Title

IX, he must show gender stereotyping-based discrimination that a school official has actual notice of and fails to act on (note that age is not protected under Title IX). *Teesdale,* 690 F.3d at 834; *Hayden*, 743 F.3d at 583.

J.H. argues that he was selected for hazing based on the following reasons: (1) he didn't conform to certain gender stereotypes (*i.e.* he wasn't "manly" enough); (2) his class year (*i.e.* freshmen were hazed; seniors were not); and/or (3) a combination of the two known as "sex-plus" whereby gender and class year both contributed to why he was selected. For his equal protection claims, all three fail because J.H. presents no evidence that the *school* or its *officials* engaged in either a custom/practice or with deliberate indifference towards him because he didn't conform with certain gender stereotypes or his class year. It may well be true that he was selected by his fellow students for hazing based on these criteria (although, based on the very thin evidence present, I'm dubious), but to prove his claim, he needs to show some action or inaction on the part of the school and/or its officials based on these criteria. And although I have found that J.H. has presented sufficient evidence that the school and its officials have discriminated against J.H. because of the fact that he is a boy and not a girl, J.H. hasn't presented any evidence that he was discriminated against because he was less of a stereotypical boy or that he was young. At bottom, the scant evidence he does present (*e.g.* being called a "cunt," "a pussy," or a "bitch" in the hallways by other students or the fact that underclassmen had to do certain things for upperclassmen) all goes to the actions of his fellow students, not school officials.

His Title IX claims based on these criteria fail for similar reasons. First, J.H. can't bring an age claim under Title IX as Title IX protects only gender-based discrimination. 20

U.S.C. § 1681(a). Regarding his gender stereotyping claim, although peer-on-peer harassment can suffice to support such a claim if J.H. can show that school officials had actual knowledge of the harassments and yet acted deliberately indifferently (*Hayden*, 743 F.3d at 583), J.H. hasn't presented enough evidence that he was selected for hazing because he didn't conform to the gender stereotypes of a boy. The only evidence J.H. cites in support of his claim is that some fellow students called him a "cunt," "pussy," or "bitch" in the hallways. Although this is far from acceptable behavior, this type of behavior without more has been found insufficient to support a Title IX claim. *Davis v. Monroe Cty. Bd. of Ed.*, 526 U.S. 629. 651-51 (1999) ("in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender"); *Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014) (finding that although use of the terms "bitch" and "whore" in the employment context can be sufficient to show gender-based discrimination, "the issue is more subtle in the school context" because kids are still learning how to interact appropriately with one another; but declining to decide whether it was sufficient in that case because the claim failed for other reasons); *Sanchez v. Carrollton-Farmers Branch Independent School District*, 647 F.3d 156, 166 (5th Cir. 2011) (rejecting Title IX student-on-student harassment claim where alleged conduct was only name calling). Without more, J.H.'s claim cannot proceed. I will therefore **DISMISS** J.H.'s Equal Protection Clause and Title IX claims based on gender stereotyping and class year.

*Retaliation Claim*

J.H. argues that Defendants have retaliated against him in contravention of both Title IX and the First Amendment for his whistleblowing of the hazing in the boys swimming program. To prove his claim under Title IX, J.H. must show Defendants engaged in "[i]ntimidatory or retaliatory acts." *Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 173 (2005). Under the First Amendment, J.H. must show that Defendants' actions were sufficient to deter free speech. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir.2012), *cert. denied,*––– U.S. ––––, 133 S.Ct. 489, 184 L.Ed.2d 298 (2012). In other words, he must show that "but for his protected speech, [Defendants] would not have taken the adverse action." *Id.* at 965. At the summary judgment stage, this translates into the following paradigm: J.H. must first present evidence that his speech was at least a motivating factor of Munster's actions and then Munster must rebut the inference created by that evidence. *Id.*

The only evidence J.H. brings forth is (1) his removal from the team email list after he chose not to swim over the summer; (2) his selection for random drug testing; (3) the refusal to protect him after reporting the hazing; and (4) Coach Pavlovich ignoring him in the hallway once.[1] To establish that any of these were motivated by his whistleblowing,

---

[1] J.H. addresses a few more pieces of evidence in a footnote of his brief without much elaboration, probably because they are not very strong. For example, J.H. states that the hair cutting "ritual" on the swim team was listed as a "proud tradition" in the MHS year book, he wasn't selected as a scholar athlete on the tennis team, and Coach Pavlovich referenced the hair cutting parties favorably in some remarks at the team banquet. These allegations are all pretty vague – most of which don't even identify who was allegedly at fault – and some don't even appear to pertain to the swim team at all. In any event, J.H. claims that all of these fall under the "suspicious timing" camp, and I find that they do not constitute the rare situation under which suspicious timing alone can carry the day.

J.H. can present either direct or circumstantial evidence. *Kidwell*, 679 F.3d at 965. The evidence outlined above all appears to be circumstantial as the jury would have to make an inference to get to the final result of retaliation. *Id*. "Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other employees in the protected group." *Id*. at 966 (internal quotation marks omitted). J.H. appears to rely primarily on (1) suspicious timing and (2) behavior towards him.

J.H.'s claims regarding his removal from the email list and his selection for random drug testing fall under the "suspicious timing" camp, which "will rarely be sufficient in and of itself to create a triable issue." *Id*. Here, I find it hasn't. Defendants have rebutted any inference of retaliation by showing that J.H. was removed from the email list because he elected not to swim during the summer session. (DE 83 at 136; DE 79-9 at 7.) They have also presented evidence that they have nothing to do with the drug-testing procedure and who is selected for drug testing – that is all done by an independent company. (DE 79-24 at 1.)

Regarding his claims about the school's failure to protect him after he reported the hazing, it is a stretch. It may very well be that Defendants engaged in impermissible discrimination or breached a duty to J.H. by failing to protect him, but I see no evidence that this was actually done in retaliation of his reporting. J.H.'s argument on his discrimination and negligence claims is that the coaches failed to supervise the locker room throughout 2009 and 2011, and in the absence of coaches being present, he was attacked. It's not as if the coaches used to police the locker rooms and then stepped out once J.H.

reported the swim team hazing. Instead, the coaches did whatever they had previously done – for better or for worse. And as for Coach Pavlovich ignoring J.H. in the hallway on one occasion, that hardly strikes me as enough to support a claim for very serious misconduct on the part of a school official.

At bottom, I recognize that J.H.'s high school experience was an incredibly difficult one due to what he faced on the swim team and I agree with him that he has presented enough evidence to allow a reasonable jury to infer that he was unfairly discriminated against and that Defendants failed in their duty to protect him. But to also find that Defendants not only failed in these regards, but actually *retaliated* against J.H. due to his reporting stretches the evidence beyond its breaking point. I will therefore **DISMISS** J.H.'s retaliation claims.

### *Indiana State Law Negligence Claim*

To prove his negligence claim under Indiana state law, J.H. must show that (1) Defendants owed him a duty; (2) Defendants breached that duty; and (3) J.H. suffered injury proximately caused by Defendants' breach of that duty. *M.S.D. of Martinsville v. Jackson,* 9 N.E.3d 230, 243 (Ind. Ct. App. 2014). Indiana courts further impose a "special duty" on schools to "exercise the level of care an ordinary, prudent person would exercise under the same or similar circumstances." *Id*. A school has a "duty to protect its student from criminal attack and breached that duty where the attacker had a propensity towards violence, the school system or school personnel was aware of this propensity; and school personnel's failure to provide adequate supervision allowed the attacker the opportunity to assault the student, proximately causing his injuries." *Id*. These questions are generally

best resolved by a jury. *Mangold v. Ind. Dept. of Nat. Res.*, 756 N.E.2d 970, 975 (Ind. 2001).

Here, J.H. has alleged his fellow students committed various acts against him on school property that amount to an assault. He was routinely hit during practice (otherwise known as "five-starring") (DE 83 at 39); hit with a plastic wiffle ball bat (*id.* at 78-80); and was once violently attacked in the locker room in an attempt to cut his hair without his consent (*id.* at 104-106). According to the evidence J.H. presents, Defendants had notice of these or similar acts prior to some of them occurring. The most salient example is the fact that by January 2011, Defendants had notice that J.H. had been assaulted at an off-campus pre-sectional swim team party in 2010 where his hair was cut against his will, and then just one month after they received notice, in February 2011, he was assaulted in another attempt to cut his hair prior to sectionals in the boys locker room. All of this occurred in the absence of supervision. Under *M.S.D. of Martinsville*, that's enough evidence for a jury to decide whether Defendants were negligent.

Further, neither Munster nor the individual school officials are protected under the Indiana Tort Claims Act. That statute requires that any claims against a governmental employee personally must allege that the employee acted in a way that is "(1) criminal; (2) clearly outside the scope of the employee's employment; (3) malicious; (4) willful and wanton; or (5) calculated to benefit the employee personally." Indiana Code § 34-13-3-5(c). J.H. has alleged that Defendants' actions were "intentional and in reckless disregard of a school's obligation to its students." (DE 15 at 7.) In other words, their actions were willful and wanton. *S.C. Nestel, Inc. v. Future Const., Inc.*, 836 N.E.2d 445, 451 (Ind. Ct. App. 2005). And although the ITCA grants immunity to governmental entities for their "performance

26

of a discretionary function" (I.C. 34-13-3-3), Munster is not immune as the issues presented here are "not the type of policy-making that [Indiana's] supreme court has since determined should be exempt from liability under the planning/operation test." *M.S.D. of Martinsville,* 9 N.E.3d at 242 (denying immunity to school district for negligence claims brought by students regarding a school shooting). In other words, the ITCA isn't geared towards protecting policies and practices aimed at harming students.

*Motions to Strike*

Defendants request that I strike Appendix I of J.H.'s summary judgment response brief for failure to comply with our local rules. I decline to do so. First, I have discretion as to whether to enforce our local rules. *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011). Second, I don't really think J.H. flouted the local rules here. Although Munster claims that Appendix I contains improper conclusory statements and arguments that are undesignated, Appendix I is really just redundant of Appendices II and III, which both include all proper citations. Appendix I was intended to be helpful, and in some ways, it was. But make no mistake – I don't rely on evidence without confirming its precise designation in the record. Because I'm able to parse out what to rely on and what to ignore, I don't see any reason to strike J.H.'s filing. As the detailed citations in this order should show, I have relied on the record itself and not the parties' characterizations of the record in making my decision. Defendants' motion (DE 88) is therefore **DENIED**.

**Conclusion**

For the forgoing reasons, Defendants' motion for summary judgment (DE 73) will be **GRANTED-IN-PART** and **DENIED-IN-PART**. All claims against the school officials

(Defendants Pfister, Tripendfeldas, Smith, and Pavlovich) in their official capacities are dismissed. J.H.'s discrimination claims based on gender stereotyping and class year under Section 1983 and Title IX are also dismissed, as is his claim for retaliation. J.H. may proceed, however, on his claims of gender discrimination under the Equal Protection Clause of the Fourteenth Amendment (via Section 1983) and Title IX, along with his state law negligence claim. The Section 1983 claim will proceed against Munster and the school officials (Defendants Pfister, Tripendfeldas, Smith, and Pavlovich) in their individual capacities, and the Title IX claim will proceed only against Munster (that claim is dismissed against the individual school officials).

Further, the Defendants' Motion to Strike J.H.'s Appendix I (DE 88) is **DENIED**.


**SO ORDERED**.

ENTERED: February 3, 2016



s/Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT